# EXHIBIT A

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

MARYBETH LEONGINI

_____
Plaintiff

vs.                                                      Case Number    **2020 CA 003256 B**

ROBERT F. POWELSON

_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Carla D. Brown
_____
Name of Plaintiff's Attorney

11260 Roger Bacon Dr., #201
_____          By _____
Address                                                                                    Deputy Clerk
Reston, VA  20190

(703) 318-6800
_____          Date    **07/24/2020**
Telephone

Clerk of the Court

如需翻譯，請打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화해 주십시오.          ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

Filed
D.C. Superior Court
08/03/2020 02:28PM
Clerk of the Court

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| MARYBETH LEONGINI<br>638 South Columbus Street<br>Alexandria, Virginia  22314<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF<br> WATER COMPANIES<br>777 6th Street, N.W., 11th Floor<br>Washington, D.C.  20001<br><br>Serve:  Michael J. Horner<br>    777 6th Street, N.W., 11th Floor<br>    Washington, D.C.  20001<br>    Registered Agent<br><br>    and<br><br>ROBERT F. POWELSON<br>Two Liberty Place<br>50 S. 16th St. Suite 2725<br>Philadelphia, Pennsylvania 19102<br><br>    Defendants. | Case No.  **2020 CA 003256 B** |

## COMPLAINT

Marybeth Leongini, by counsel, hereby moves this Court for Judgment against

NATIONAL ASSOCIATION OF WATER COMPANIES and ROBERT F. POWELSON,

jointly and severally, and in support thereof, states as follows:

1.      This is a civil action arising out of discrimination on the basis of marital status,

specifically the creation and maintenance of a hostile working environment, by Defendants

National Association of Water Companies and Robert F. Powelson, during the course of employment, and in the termination, of Plaintiff Marybeth Leongini.

2.     This action also states a claim against the Defendants for violation of the D.C. Wage Payment and Collection Law ("DCWPCL").

3.     This action is brought under the District of Columbia Human Rights Act, D.C. Code §2-1401.01 *et seq.*; the DCWPCL, D.C. Code § 32-1301, *et seq.*; and under the common law of the District of Columbia.

## PARTIES

4.     Plaintiff Marybeth Leongini ("Ms. Leongini") is a resident and citizen of the Commonwealth of Virginia.  At all times relevant hereto, Ms. Leongini was employed by the National Association of Water Companies in the District of Columbia.

5.     Defendant National Association of Water Companies ("NAWC") is a non-profit corporation organized under the laws of the District of Columbia.

6.     NAWC members are located throughout the United States, ranging in size from large companies owning, operating or partnering with hundreds of utilities in multiple states, to individual utilities serving a few hundred customers.

7.     Defendant Robert F. Powelson ("Mr. Powelson") is, and was, the President and Chief Executive Officer of NAWC, with supervisory authority over Ms. Leongini in the District of Columbia.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over Ms. Leongini's claims under the common law of the District of Columbia.

9.     The amount in controversy exceeds the jurisdictional minimum amount for this Court.

10.    NAWC is an "employer" within the meaning of D.C. Code § 2-1401.02(10).

11.    NAWC is present in and conducts business in the District of Columbia, and is subject to the personal jurisdiction of this Court.

12.    At all times relevant hereto, NAWC was Ms. Leongini's "employer" within the meaning of D.C. Code § 2-1401.02(10).

13.    At all times relevant hereto, NAWC was present in, and conducted business in, the District of Columbia, and therefore is subject to the personal jurisdiction of this Court.

14.    For the majority of the time relevant hereto, Mr. Powelson was employed as a managerial and supervisory employee of NAWC in Washington, D.C., with supervisory authority over Ms. Leongini.

15.    The tortious acts alleged in this Complaint were committed in the District of Columbia.

16.    Venue over Ms. Leongini's claims is proper in this Court.

## **BACKGROUND**

17.    Ms. Leongini began her employment with NAWC in October 2012 in the position of Director of Communications, at its headquarters in Washington, D.C.

18.    At all times relevant hereto, Ms. Leongini performed her job in an exemplary manner, receiving positive performance reviews each year with ratings of "exceeds expectations," and corresponding salary increases.

19.    In 2018, based on her experience and performance, Ms Leongini was asked by the NAWC Board of Directors to step in as interim Executive Director, and she held that position

from February–August 2018.  During this time, Ms. Leongini also continued to perform all of the duties of her initial role (which was then Director of Communications), in addition to her duties as interim Executive Director.

20.     The Board, as well as NAWC members, were extremely complimentary of Ms. Leongini's performance, both in her Communications role, and as interim Executive Director.

21.     On June 27, 2018, during the NAWC Board of Director's meeting in Philadelphia, Pennsylvania, Christopher Franklin (the then-Chairman of the Board) informed Ms. Leongini that in recognition for her work as interim director, she would be receiving a salary increase and a Vice President title.  He also specifically told her that after NAWC headquarters relocated to Philadelphia, it would retain an office in Washington, D.C., and Ms. Leongini would be able to work from the D.C. office.  Ms. Leongini received special recognition during the Board dinner for her work as interim director.

22.     Mr. Powelson was introduced during the dinner and Board meeting as the newly hired CEO, effective August 2018.

23.     On August 17, 2018, at Mr. Powelson's request, Ms. Leongini travelled to Philadelphia to tour office space being considered by Mr. Powelson for the new NAWC headquarters.  When Ms. Leongini expressed her concerns to the real estate broker about one office space visited (especially that it was not downtown), the broker commented, "Well, Rob Powelson likes it and you better like it if you like your job."  Ms. Leongini was taken aback by this comment.

24.     Almost immediately after Mr. Powelson's hire, he began to subject Ms. Leongini to hostile and disparate treatment, and he regularly engaged in conduct intended to embarrass, demean and humiliate Ms. Leongini in front her colleagues.

4

25.     In late August or early September 2018, while in Mr. Powelson's office, Ms. Leongini asked how the plans for the relocation were coming along.  Mr. Powelson, without bothering to look up, responded, "Why would I tell you that?"  Mr. Powelson's response, aside from being rude and dismissive, was meant to, and did, humiliate and demean Ms. Leongini.

26.     When Ms. Leongini later asked Rikardo Hull ("Mr. Hull") (EVP, Strategy and External Affairs) for advice on working with Mr. Powelson, Mr. Hull told her, "You need to understand he is like a very large child."

27.     On October 16, 2018 during a NAWC staff retreat in Philadelphia, Mr. Powelson told the staff that he was aware that a staff member had spoken about him with a Board member during the NAWC Water Summit (October 7-9, 2018), and he warned that if he learned any staff member spoke about him to a Board member, "There will be consequences."  Mr. Powelson's words were meant to be, and were perceived as, a threat to anyone's job security who complained about him or his conduct – a protected activity.

28.     Ms. Leongini traveled to Monterrey, California to attend the California Water Association's ("CWA") Annual Conference (October 29-31, 2018) along with Mr. Powelson and Mr. Hull.  Since Shannon Dean (VP of Corporate Communications and Community Affairs for Cal Water Service) planned to introduce Mr. Powelson on stage before his remarks, Ms. Leongini brought Ms. Dean over to Mr. Powelson so they could meet prior to her introduction. Ms. Dean greeted Mr. Powelson warmly, and said she was a huge fan of Ms. Leongini.  Mr. Powelson stared blankly at Ms. Dean and did not respond.  Ms. Leongini later cautioned Ms. Dean not to compliment her in the presence of Mr. Powelson.

29.     After Mr. Powelson's luncheon address, several NAWC members present expressed concern regarding Mr. Powelson's  use of the phrase "punch them in the throat" when

referring to municipal water systems.  At least one state regulator who was present was also upset at Mr. Powelson's words.

30.     During the time period August – November 2018, Ms. Leongini routinely asked Mr. Powelson when her promotion to Vice President would be announced.  Each time, he evaded answering, and responded that they would discuss it "soon."

31.     During the week of November 12, 2018, Ms. Leongini traveled to Orlando, Florida along with Mr. Powelson, Mr. Hull and April Ballou ("Ms. Ballou") (VP, Legal and State Regulatory Policy), where each gave a presentation at a NAWC member breakfast meeting. At the conclusion of the meeting, Mr. Powelson asked Ms. Leongini to join him for dinner.

32.     On the way to dinner, Mr. Powelson made several comments about not knowing anything about Ms. Leongini's personal life.  Ms. Leongini didn't respond to these comments. During dinner, Mr. Powelson confirmed that Ms. Leongini would be receiving a promotion to VP and a salary increase.  However, Mr. Powelson still did not announce Ms. Leongini's promotion until a full three months later.

33.     From the time Mr. Powelson joined NAWC, Ms. Leongini's responsibilities continued to increase while her overall salary and benefits decreased.  Several members of the Board of Directors who were also on the Contract Operations Committee had taken notice of Ms. Leongini's workload and discussed with Mr. Powelson hiring someone to support her.  One of them was the incoming 2019 Chairman of the Board of Directors and the others were Chairs of the Contract Operations Committee.

34.     In response, Mr. Powelson hired one (male) intern toward the end of 2018, who he recently met at his golf club.  Although Mr. Powelson said that the intern would support Ms. Leongini on the Contract Operations Committee and with another project, the intern was

frequently absent, including often golfing with Mr. Powelson, or attending other meetings at the behest of Mr. Powelson, and therefore not completing any of the work for which Ms. Leongini needed him.  The intern often missed meetings and deadlines and never took notes during meetings even though he was repeatedly asked to and reminded it was one of his primary duties. The intern was the sole representative from NAWC to attend the NARUC 2019 Western Conference in Wyoming (which required him to be out of the office for the majority of the week), because neither Mr. Powelson or Ms. Ballou (VP, of Legal and State Regulatory Policy) wanted to travel to Wyoming. When Ms. Leongini brought these issues and the delays they were causing with her projects to Mr. Hull's attention, he told her to "let it go" since the intern would be leaving soon and it would anger Mr. Powelson.  Mr. Hull mentioned that Mr. Powelson's Chief of Staff had expressed similar frustrations with the intern to him.

35.     In sharp contrast to the lack of support afforded to Ms. Leongini, since joining NAWC, Mr. Powelson has taken a number of responsibilities off of Mike Horner ("Mr. Horner") (Director of Administration and Membership and a fellow D.C. employee, whom he also "inherited").  Mr. Horner is married.

36.     On December 10, 2018, after a meeting with NAWC's Strategic Planning Committee in Philadelphia, Ms. Leongini met with Committee member Maureen Duffy, and expressed her concerns regarding Mr. Powelson's hostile treatment towards her, telling Ms. Duffy that Mr. Powelson had made it very clear that he did not like Ms. Leongini.

37.     On December 12, 2018 Ms. Leongini had a breakfast meeting with Beate Wright, Executive Director of the Water Research Foundation.  During their meeting Ms. Leongini shared her concerns about Mr. Powelson and his treatment of her.  Ms. Leongini also met with

Ms. Wright on May 3, 2019 and October 14, 2019, and told her the ongoing details of Mr. Powelson's hostile and inappropriate treatment of her.

38.     On December 18, 2018, towards the end of the NAWC holiday dinner, Mr. Powelson commented to the group that he did not want to hear any further comments about the "Philly team" versus the "D.C. team," and that he was glad things had improved.  However, the next time Ms. Leongini spoke with Mr. Powelson, Mr. Powelson told Ms. Leongini that sitting next to Mike Horner (a fellow D.C. employee) during the holiday dinner was a mistake, and that by doing so, she had contributed to the divide between the "teams."  Mr. Horner later confirmed to Ms. Leongini that Mr. Powelson had not made any similar comment to him, and although he was also a D.C. employee and engaged in the same conduct (sitting next to a D.C. employee at the holiday party), he was not treated in a similar manner and only Ms. Leongini was reprimanded.

39.     On January 11, 2019 Tim Lahey (a NAWC member) sent Ms. Leongini a text message saying that the "Truth from the Tap" consultant, Kyle Butts "did a wonderful job" presenting the campaign.  Ms. Leongini was in charge of this campaign for NAWC.

40.     On January 14, 2019 Mr. Lahey sent a second text message to Ms. Leongini, asking for Mr. Powelson's  email address.  After Mr. Lahey sent an email to Mr. Powelson complimenting the campaign and Mr. Butts' presentation, Mr. Powelson accused Ms. Leongini of soliciting compliments from Mr. Lahey.

41.     In mid to late January 2019, at a staff meeting that took place shortly after the NAWC Contract Operations committee was held in Philadelphia (January 14), Mr. Powelson inexplicably accused Ms. Leongini of giving him food poisoning during the committee meeting.

As Ms. Leongini pointed out, it was a buffet lunch, and Mr. Powelson had chosen his own food (which had not been prepared by Ms. Leongini).

42.     On January 25, 2019, when Ms. Leongini arrived at the office around 10 a.m., she overheard Mr. Powelson in his office (which was next to Ms. Leongini's office) having a conversation with Mr. Hull and Mr. Horner.  During the conversation Mr. Powelson repeatedly referred to Ms. Leongini as "bitter" and "shady" and referenced a comment Ms. Leongini had made during a staff meeting earlier that month stating that she thought staff bonuses should be based on performance rather than a uniform percentage as they had traditionally been.  During the staff meeting Mr. Powelson had responded by laughing and stating that  bonuses would be awarded however he wanted them to be.  Notably, Ms. Leongini's bonus for 2018 (awarded in 2019) was based only on her salary as Director of Communications and did not take into account her salary earned during the time she was serving as both Director of Communications and interim Executive Director.

43.     When Ms. Leongini confronted Mr. Horner that afternoon about what she had overheard, he apologized.  Ms. Leongini also met with Mr. Hull to ask how she should address Mr. Powelson's comments.  Mr. Hull advised against it, and said that Mr. Powelson was likely to "blow up" if she confronted him about his derogatory comments.

44.     On February 7, 2019, Mr. Powelson finally (and unexpectedly) announced Ms. Leongini's promotion during a meeting of NAWC's Communications Council held in Washington, D.C.  After the meeting adjourned, Mr. Leongini met with Denise Kruger (a Senior VP with Golden State Water Company, and a member of NAWC Communication Council) and shared with her how Mr. Powelson had been treating her.

9

45.     On March 5, 2019, NAWC external consultants Kristin Elder and Kyle Butts traveled to D.C. to meet with Mr. Powelson, Mr. Hull and Ms. Leongini to provide an overview of successes with NAWC communications to date and the plan for the remainder of the year. During the meeting Mr. Powelson again accused Ms. Leongini of soliciting members to send him emails complimenting her work/the Truth from the Tap campaign.  This allegation was, of course, completely untrue, and receiving unsolicited complimentary emails from members was consistent with Ms. Leongini's performance throughout her tenure at NAWC.

46.     On March 25, 2019,  Ms. Leongini was informed by Mr. Hull that she would be reporting directly to him.  This made Ms. Leongini the only staff member that did not report directly to Mr. Powelson.  This change in reporting structure came just days after Ms. Leongini had an uncomfortable encounter during which Mr. Powelson came to her office and, when she stood up, he looked her up and down, shook his head, heavily exhaled and excused himself.

47.     During the week of May 9, 2019, in anticipation of the relocation of NAWC headquarters to Philadelphia, the D.C. team moved offices to an extremely small WeWork space (a shared workspace).  Despite very clear (and multiple) labeling as to their destination (since some items were going to Philadelphia, and some were moving to the new D.C. space), Ms. Leongini's boxes were sent to the storage unit in Philadelphia.  Two of the boxes labeled for the D.C. WeWork space contained Ms. Leongini's files for current projects. Ms. Leongini called Mr. Hull as soon as she realized what had happened, but he sent her call to voicemail and less than a minute later, he called Meghan Estenson who was two seats away from Ms. Leongini.  Mr. Hull never returned Ms. Leongini's phone call.  When Ms. Leongini called the moving consultant, he suggested she drive to Philadelphia to retrieve the boxes.  Ms. Leongini was the only employee who had labeled her items, and was the only employee whose items were misplaced during the

move.  Mr. Powelson and Mr. Hull were amused by the situation and told Ms. Leongini they

would handle it with the moving company.  Ms. Leongini did not receive her boxes until May 28

-  almost three weeks later.

48.     On May 21, 2019, during the NAWC Cybersecurity Symposium in Washington,

D.C., NAWC's government relations consultant Brent Fewell pulled Ms. Leongini aside and

asked how things were going.  Ms. Leongini told Mr. Fewell about Mr. Powelson's hostile and

discriminatory comments and behavior toward her.

49.     In late May 2019, two of the Alexandria, Virginia metro stations closed down. As

a result, Ms. Leongini's commute increased from 30 minutes to over an hour, and sometimes as

long as 90 minutes.  Since Ms. Leongini regularly took her laptop home and continued to work

once she was home, she asked Mr. Hull if she could leave 30 minutes earlier each day to beat

traffic and continue to work from home, until school was out for summer and traffic eased

(approximately three weeks).  Mr. Hull responded that he would have to run it by Mr. Powelson.

A few days later, Mr. Hull informed Ms. Leongini that Mr. Powelson had not approved her

request to leave early.  In sharp contrast, Meghan Estenson ("Ms. Estenson"), who was engaged

to be married at the time, received Mr. Powelson's approval to take an extensive leave of

absence shortly after the office relocation.  Mr. Powelson told Ms. Leongini and Mr. Horner that

Ms. Estenson would be completing an internship at the Department of Justice. She returned

weeks after her wedding which took place on July 13. Ms. Estenson remained on the NAWC

payroll throughout her leave of absence.

50.     On Thursday, June 20, 2019, during the Board meeting, Mr. Powelson made

several remarks about consultants and stated there were no "sacred cows," including the

communications consultants.  In prior conversations, when Mr. Powelson had indicated he was

considering making a change in communications firms, Ms. Leongini only asked that the existing consultant/firm (referred to herein as "Firm HK"), with whom she had a good working relationship, have an opportunity to rebid on the work.  That same day, Mr. Powelson, Mr. Hull and Ms. Leongini met with another communications firm (referred to herein as "Firm LS") at Firm LS's offices to discuss its ideas.  Ms. Leongini was then asked to prepare a memo outlining any concerns she had regarding the Firm LS proposal.

51.     On or around July 15 or 16, 2019, during lunch, Mr. Powelson falsely accused Ms. Leongini of having the consultant from Firm HK draft the memo she had sent to Mr. Hull and Mr. Powelson earlier, outlining her concerns with a proposed change to the communications firm, which had included the size, experience and lack of resources (video, graphic design) of Firm LS versus those of Firm HK.  This allegation was, of course, completely untrue.  Ms. Leongini had not shared the Firm LS proposal or her memo in response with anyone.

52.     During this same lunch, Mr. Powelson told Ms. Leongini that none of her colleagues liked her, and that he held her responsible for the divide that existed between what Mr. Powelson continued to refer to as the "Philly team" and the "D.C. team."

53.     In response, Ms. Leongini stated that she felt it was Mr. Powelson who was responsible for the perceived divide (including by his continuous references to the "Philly team" versus the "D.C. team"), but that she thought things had improved considerably.  Ms. Leongini also addressed his treatment of her, pointing out that she was the only one on the team that he regularly screamed at, and that she never heard him raise his voice to Christine Costello or April Ballou (both married, with children).  Mr. Powelson did not deny screaming at Ms. Leongini. His only response was, "Who could yell at April? She's so nice."

54.     Ms. Leongini then asked if she could enlist the assistance of Christine Costello ("Ms. Costello") (NAWC's Director of Events and Corporate Sponsorships), for developing the registration page for the new Condemnation & Referendum Campaign School.  He agreed.  After Ms. Leongini sent the information to Ms. Costello, she responded that she would need 7-10 days.  It ended up taking much longer, and her work product was unusable.  Mr. Horner ended up taking over the project after Ms. Costello stopped responding to Ms. Leongini's requested changes.  Ms. Costello's involvement delayed Ms. Leongini's timeline for the school by almost a month.

55.     On July 17, 2019, Mr. Hull informed Ms. Leongini that they were officially changing communications firms effective August 31, and instructed Ms. Leongini to give Firm HK notice.

56.     On August 1, 2019, Mr. Powelson inexplicably zeroed out Ms. Leongini's accrued PTO (consisting of 203.50 hours of vacation time and 289.61 hours of sick leave, as of July 15, 2019).  When Ms. Leongini questioned Mr. Powelson about her leave during a phone call, his only response was that he had changed the policy.

57.     On August 13, Ms. Leongini was informed by Mr. Powelson's Chief of Staff that Mr. Powelson wanted to meet the following week.  During the meeting they discussed the next steps in changing communication firms and onboarding Firm LS.  When Ms. Leongini suggested having the new firm join the next meeting of NAWC's Communication Council, he became angry, said he would not allow it, and stated that the new firm "wasn't going to kiss anyone's ring."  Mr. Powelson did not like that Firm HK praised Ms. Leongini and that Ms. Leongini and the Firm HK consultants had an extremely positive working relationship, and he refused Ms. Leongini's suggestion.

58.     During this meeting, Mr. Powelson also told Ms. Leongini he was still "testing" her and that the new firm, Firm LS, would be watching her and reporting back to him.  Once Firm LS was onboard, during the weekly calls, Josh Lahey (the primary point of contact for Firm LS), routinely started the calls by asking whether Ms. Leongini was in the office – checking on her whereabouts for Mr. Powelson.

59.     Also during the meeting with Mr. Powelson, Ms. Leongini inquired about the plans for building out support for the communications team.  Mr. Powelson, Mr. Hull and Ms. Leongini had previously engaged in multiple conversations about Ms. Leongini's need for support based on Ms. Leongini's disproportionate amount of responsibilities for NAWC's committees, subcommittees and new initiatives.  During earlier conversations on this topic Mr. Powelson indicated NAWC was planning to hire support, most likely an intern, to handle some of the administrative tasks associated with managing the committees.  However, during this meeting, Mr. Powelson said his plan was to hire a few junior level staff, whose primary duties would be to support Mr. Hull and Ms. Ballou specifically with regards to travel.  Mr. Powelson said that since both Mr. Hull and Ms. Ballou both had families, it was not fair to make them travel.

60.     On August 20, 2019, Mr. Powelson, Mr. Hull, Ms. Ballou and Ms. Leongini met with Agency M at its offices in Philadelphia.  Much of the conversation centered around making a greater distinction between NAWC member companies (private water companies) and municipal water utilities.  After the meeting, when Ms. Leongini asked how aggressive he wanted the external messaging to be in drawing the distinction, Mr. Powelson replied, "Cut their balls off."

14

61.     Around this same time, Mr. Powelson announced that Mr. Hull would be taking

over the Customer Satisfaction Committee and Ms. Ballou would take over to staff the Contract

Operations Committee which allow Ms. Leongini more time to focus on communications

initiatives.  Ms. Leongini met with Mr. Hull and Ms. Ballou individually shortly after that to

review the initiatives underway with each group.  As of January 2020, Mr. Hull had not assumed

any responsibility for the Customer Satisfaction Committee, and Ms. Ballou was only slightly

engaged with the Contract Operations Committee.  Ms. Ballou shared with Ms. Leongini that she

felt it was a waste of her time since she was not familiar with the Con Ops side of the business

and she did not think it was very important to the organization since the Con Ops committee

members did not contribute significant dues revenue.

62.     During the August and September staff planning calls for the 2019 NAWC

Summit, Mr. Powelson regularly criticized the agenda for the 2018 NAWC Summit, for which

Ms. Leongini was primarily responsible for creating.  His main criticism was that representatives

from American Water (NAWC's largest member) had dominated panels at the 2018 Summit, and

he decreed that it was not to happen again in 2019.  After Ms. Leongini explained that American

Water members were often the first to volunteer when speakers were requested for panels, Mr.

Powelson repeated her comments in a mocking manner during future planning meetings, rolling

his eyes as he spoke.

63.     Mr. Powelson's conduct was meant to (and did) belittle and demean Ms. Leongini

in the eyes of her colleagues.

64.     On September 11, 2019, during the staff retreat in Philadelphia, Ms. Costello

(married) announced that she wanted Ms. Leongini to handle all pre-production for the annual

conference which was being held October 13-15, 2019.  Since Ms. Leongini was a level above

Ms. Costello, it was clear Ms. Costello had discussed this with Mr. Powelson and/or Mr. Hull in advance of the retreat.  Ms. Leongini responded that since it was not a communications function, and she was already organizing a full-day event for Sunday, October 13, that her current workload would not allow her to take on this extra responsibility, but that she would be happy to take on whatever was needed once she got on-site.  Ms. Leongini followed up by asking Ms. Costello directly why she was not handling pre-production herself, since it was part of Ms. Costello's job function.  In telephone conversations over the next few days, Mr. Hull told Ms. Leongini he was so "pissed off" at her for what she said that he could not sleep.  In a separate phone call, Mr. Powelson accused Ms. Leongini of ruining the staff retreat and said she needed to become a team player.

65.     Apparently, Mr. Powelson's view of being a "team player" was for Ms. Leongini to become even more overburdened, without adequate support, by taking on the additional duties of her married colleagues, whether or not those duties fell within the purview of her communications department.

66.     Other staff members (those who were married and/or with families) were not asked to take on large areas of responsibilities which fell outside of their area, on top of an already full capacity workload.

67.     On September 20, 2019, Ms Leongini sent an email request to Mr. Hull, asking for permission to travel and present an update on NAWC's Truth from the Tap campaign during the California Water Association's Public Information Committee Meeting (November 13-15, 2019).  Mr. Hull responded that he would discuss the request with Mr. Powelson, later informed Ms. Leongini that her request was denied, and suggested she send Truth from the Tap consultant Kyle Butts instead.

68.     During a staff planning meeting in late September or early October 2019, Ms. Leongini updated the group about her discussions with Yvonne Nomizu (consultant to NAWC's Customer Satisfaction Committee, and the CEO & Managing Director of Pacific Consulting Group) about how to best facilitate audience questions during an upcoming panel discussion at the 2019 NAWC Water Summit.  Mr. Powelson became irate and yelled at Ms. Leongini  that nothing would be done to accommodate Ms. Nomizu beyond what was already available.  Ms. Ballou agreed with Mr. Powelson and adding, "What's the worst that can happen? She doesn't want to speak at next year's Summit?"

69.     NAWC's largest event of the year (NAWC Water Summit) was held October 13-15, 2019 in Nashville.  Since Ms. Leongini had a separate event (NAWC Condemnation & Referendum Campaign School) on October 13 in Nashville, she traveled to Nashville on October 11.  Despite this, at one point during the NAWC Water Summit, when Ms. Leongini passed by Mr. Powelson, he told her in a mocking tone "You shouldn't be here."

70.     After the success of the Condemnation and Referendum campaign school (the event Ms. Leongini had prior to the Summit in Nashville), Ms. Leongini sent both Mr. Hull and Mr. Powelson a PowerPoint which summarized the attendee evaluations and feedback, all of which was very positive.  Neither responded to the email and it was not uncommon for them to disregard any significant accomplishment she had made.

71.     October 25, 2019, during a phone conference with Mr. Powelson and Mr. Lahey to address a news article critical of a member company, Ms. Leongini recommended that NAWC not respond to the article (since it was in a very small publication, and responding to it would call attention to it).  After Josh Lahey disagreed, Mr. Powelson lost his temper and screamed at Ms. Leongini for close to five minutes.  Ms. Leongini later received a text message from Mr.

Lahey apologizing if he had contributed to Mr. Powelson's "blowup." In two separate phone

calls and by email the company confirmed to Ms. Leongini they did not want NAWC to respond.

72.     On November 5, 2019, Mr. Powelson sent an email to Ms. Leongini and Ms.

Estenson with draft language for a plaque he was having made for an outgoing member of the

Board.  The copy incorrectly credited her for a year of service and Ms. Leongini responded by

asking if she could send corrected copy to the company producing the award.  His response was

"Before I scream, could you please stand down on this one?"

73.     During Ms. Leongini's employment, in addition to treating her differently than he

treated her married colleagues/colleagues with children, Mr. Powelson made multiple comments

comparing Ms. Leongini (negatively) to her colleagues who have spouses and children.

74.     Such comments, in addition to violating the D.C. Human Rights Act, violated

NAWC's Employee Handbook which states:

> Anti-Harassment: (1) The term "harassment" includes harassment based on any
> category protected by federal, state or local law, which may include, but is not
> limited to, unwelcome slurs, jokes . . . relating to an individual's . . . marital
> status . . .

75.     NAWC did not have a policy in place regarding the timing of submitting expense

reports.  Mr. Powelson received monthly financial reports showing Ms. Leongini's expenses

prior to the expenses being allocated to a particular department or project.  Mr. Horner also

reviewed Ms. Leongini's credit card statement each month (as he did with all staff members who

had company cards), to ensure they were not being used inappropriately.

76.     However, on November 21, 2019, Mr. Hull instructed Ms. Leongini not to "go to

sleep until they [her expense reports] are done."  Mr. Hull also said there would be "disciplinary

action" and stated it would impact Ms. Leongini's bonus – that it was likely she would not

receive one.

18

77.     During a call with Mr. Powelson that same day, he made several discriminatory and hostile comments, including:

- That he had inherited Ms. Leongini and Mr. Horner and should have been able to bring his own team on board instead (he did not make this same comment to Mr. Horner);

- Ms. Leongini's colleagues travel and THEY leave their spouses and children and still manage to get their expenses in on time (he repeated this several times);

- He compared dealing with Ms. Leongini to dealing with his 10-year old child;

- He repeatedly stated that Ms. Leongini had never respected him as the leader of NAWC;

- That he has made changes and knows that Ms. Leongini is not happy with some of them;

- He asked Ms. Leongini what she wanted and she told him, "I love my job." He replied, "You keep saying that, but it's not enough."

78.     On the same call Mr. Powelson also accused Ms. Leongini of committing fraud using her corporate credit card, and said there would be an investigation.  He asked, "How would you feel if I called David Stanton [NAWC 2019 Board chair] and told him this afternoon that you had committed fraud?"  When Ms. Leongini replied that she did not know how Mr. Stanton would respond, Mr. Powelson said that Ms. Leongini's inability to provide a response was "bizarre, bizarre, bizarre."  He had his chief of staff confiscate Ms. Leongini's corporate credit card.

79.     On December 9, 2019, Ms. Leongini discussed the discriminatory and hostile treatment to which she was being subjected with Rich Henning (NAWC Member/ Communications Council).

80.     On December 14, 2019, Ms. Leongini responded to an email from Mr. Hull regarding her expense reports.  Ms. Leongini had learned from Mr. Hull earlier that after her phone conversation with Mr. Powelson on November 21, 2019, Mr. Powelson had the external

19

accounting firm conduct a "forensic review" of her credit card statements and expense reports, and that an approximate $2,600 discrepancy had been discovered (amounts charged to Ms. Leongini's corporate card, but not accounted for on her expense reports). Ms. Leongini explained, and later confirmed by email, that the expenses in question were related to a trip to Colorado for an AWAA Committee she served on, and since those expenses had been reimbursed by AWAA directly to NAWC, they did not appear on Ms. Leongini's expense reports. There was no fraud committed by Ms. Leongini. In sharp contrast, Mr. Powelson's corporate credit card was "seriously delinquent" for months and eventually his account was closed.

81.     In January 2020, NAWC headquarters relocated to Philadelphia, Pennsylvania.

82.     Mr. Powelson had previously informed Ms. Leongini, on multiple occasions, that she would be required to relocate to Philadelphia once the office was up and running. Ms. Leongini was the only staff member based in D.C. that would be required to relocate (and it was ultimately agreed that she would work in Philadelphia Monday through Thursday, and could work out of the D.C. office on Fridays). Mike Horner and Meghan Estenson, both married, were not required to relocate and would both be allowed to work out of the D.C. office five days a week. April Ballou, who is married with children, was allowed to work from her home in York, Pennsylvania. Ms. Leongini, who is not married, and does not have children, was the only one who would be required to relocate.

83.     On January 3, 2020, Ms. Leongini emailed Mr. Hull asking if she should report to the D.C. or Philadelphia office the following week. He replied that she should plan on working from the D.C. office for the early part of the week.

84.     On January 6, 2020 Meghan Estenson informed Ms. Leongini that Mr. Powelson and Mr. Hull were in town and wanted to meet with her in one of the WeWork conference rooms.  During that meeting Ms. Leongini was informed by Mr. Hull that her employment was terminated and she was presented with a severance agreement.

85.     Mr. Hull did not give Ms. Leongini any reason for her termination, and Mr. Powelson said the expense reports were the "last straw."

86.     Mr. Powelson also falsely accused Ms. Leongini of leaving a software expense out of the budget for 2020 which, he said, would "cause issues."  Mr. Powelson made this accusation despite the fact that Ms. Leongini and Mr. Horner had explained to Mr. Powelson several times that the software item was indeed included in the 2020 budget, but he refused to listen.  In contrast to how Ms. Leongini was treated, no adverse action was taken against Mr. Horner for allegedly leaving the software item out of the budget.

87.     Mr. Hull attempted to pressure Ms. Leongini into signing the severance agreement, which included a release of claims and also barred Ms. Leongini from seeking employment with any company associated with NAWC, by stating that NAWC would characterize her separation as being based on her not wanting to relocate to Philadelphia rather than a termination if she signed the agreement, and that  NAWC would oppose any attempts by her to collect unemployment benefits if she did not sign.

88.     The severance offer was rescinded via an email from Mr. Hull on January 28, 2020, when Ms. Leongini did not sign it.

89.     Ms. Leongini was not terminated for performance based reasons, and NAWC did not follow or implement the steps of its progressive discipline policy, as outlined in the NAWC Employee Handbook, prior to terminating Ms. Leongini.

90.     In addition, according to NAWC's Severance Policy (referenced in the addendum to the Employee Handbook) which states that "[r]egular severance benefits will be granted according to the following schedule of benefits," Ms. Leongini was (and is) entitled to 26 weeks of severance - $90,458.29 – which should have been paid to Ms. Leongini on the next business day following her termination.

91.     Ms. Leongini was also never compensated for her unused and earned vacation and PTO time as required pursuant to NAWC's handbook and D.C. law (vacation pay qualifies as "wages" under the DCWPCL), in the amount of $11,561.76.  This amount is referenced in a February 3, 2020 letter received by Ms. Leongini from NAWC counsel which states NAWC will "move forward with paying you for your earned unused vacation days, specifically (18) vacation days, pursuant to the terms outlined in the NAWC handbook."  This amount does not include the 200 hours of unused and earned PTO that Mr. Powelson arbitrarily deleted in August 2019 with no warning, which Ms. Leongini was not given the opportunity to use, which equates to an additional $16,058.

92.     NAWC also failed to pay Ms. Leongini her bonus for 2019, which she should have received in January 2020, in the approximate amount of $8,375.00 (approximately 5% of her salary).

93.     Ms. Leongini also did not receive her final paycheck the day after her termination, as is required under D.C. Code §32-1303(1), as well as some amounts that remain due and owing to her based on expense reports submitted.  Ms. Leongini did not receive her final paycheck until January 15, 2020, in violation of the DCWPCL.

**COUNT ONE –**
**DISCRIMINATION IN THE COURSE OF EMPLOYMENT IN**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against National Association of Water Companies)**

94.     The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

95.     Ms. Leongini was an employee of NAWC within the meaning of D.C. Code § 2-

1401.02(9).

96.     NAWC is an employer within the meaning of D.C. Code § 2-1401.02(10).

97.     NAWC, through its agents, officers and employees, discriminated against Ms.

Leongini on account of her marital status (single) during the course of Ms. Leongini's

employment.  This discrimination was with respect to the terms, conditions, and privileges of

Ms. Leongini's employment, in violation of D.C. Code § 2-1402.11.

98.     As set out above in this Complaint, the acts of discrimination by NAWC included,

but were not limited to: singling out Ms. Leongini by making demeaning and derogatory

comments based on her marital status; yelling and screaming at Ms. Leongini in meetings, in the

presence of her colleagues; Mr. Powelson ordering Ms. Leongini to change seats in a staff

meeting to sit across from him so that he could watch her; subjecting Ms. Leongini to undue

scrutiny (including having a consultant "watch" her and report back) that her married colleagues

were not subjected to; accusing Ms. Leongini (and no one else) for creating the divide between

the D.C. team and Philly team, including by reprimanding Ms. Leongini for sitting next to a D.C.

colleague at the holiday dinner, while not criticizing the other (married) D.C. employee for the

very same conduct; denying Ms. Leongini travel approval; denying Ms. Leongini's request to

temporarily leave 30 minutes early (while continuing to work at home) due to temporary Metro

shutdowns affecting her commute while allowing a married colleague to remain on NAWC

payroll during a leave of absence for an internship; providing support for Ms. Leongini's married

colleagues (or colleagues with children) but not for Ms. Leongini; requiring Ms. Leongini to take

on duties and responsibilities out of her area, when she was already overburdened, with no

support, and accusing her of not being a "team player" when she resisted; accusing Ms. Leongini

of soliciting her own positive feedback from members (despite the fact that her track record and

performance supported and warranted the praise); holding Ms. Leongini to different standards

than her married colleagues/colleagues with families; and generally treating Ms. Leongini in a

hostile manner with disparate treatment while not treating married employees/employees with

families in the same manner.

99.     NAWC engaged in the discriminatory conduct set forth above and throughout this

Complaint based on Ms. Leongini's marital status (single) in violation of D.C. Code § 2-

1402.11(a)(1).

100.    This discrimination involved and affected the terms, conditions, and privileges of

Ms. Leongini's employment in violation of D.C. Code § 2-1402.11.

101.    The actions of NAWC had the effect and consequence of violating the provisions

of the D.C. Human Rights Act, D.C. Code § 2-1401, *et seq*., in violation of D.C. Code § 2-

1402.11.

102.    The discriminatory actions of NAWC were intentional, were actuated by malice,

spite, and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for

Ms. Leongini's rights.

103.    As a direct and proximate result of NAWC's conduct, Ms. Leongini has suffered,

and will in the future suffer, great damage including loss of past and future income, loss of

employee benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to her reputation, mental anguish, stress, pain and suffering.

104.    As a direct and proximate result of NAWC's discrimination, Ms. Leongini is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq*.

105.    Due to the character and severity of the actions of NAWC, and consistent with their intentional discrimination, Ms. Leongini is also entitled to punitive damages.

**COUNT TWO –**
**AIDING AND ABETTING DISCRIMINATION**
**IN THE COURSE OF EMPLOYMENT IN VIOLATION**
**OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against Robert F. Powelson)**

106.    The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

107.    Through his individual actions, Mr. Powelson aided and abetted the discrimination against Ms. Leongini, as described in more detail in Count I above and throughout this Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Powelson aided and abetted the discrimination by NAWC because of his bias against Ms. Leongini based on her marital status (single).

108.    Acts of discrimination aided and abetted by Mr. Powelson in supporting, condoning and failing to bring an end to acts of discrimination by NAWC include those set forth in this Count and throughout the Complaint:  singling out Ms. Leongini by making demeaning and derogatory comments based on her marital status; yelling and screaming at Ms. Leongini in

25

meetings, in the presence of her colleagues; ordering Ms. Leongini to change seats in a staff meeting to sit across from him so that he could watch her; subjecting her to undue scrutiny (including having a consultant "watch" her and report back to him) that her married colleagues were not subjected to; accusing Ms. Leongini (and no one else) for creating the divide between the D.C. team and Philly team, including by reprimanding Ms. Leongini for sitting next to a D.C. colleague at the holiday dinner, while not criticizing the other (married) D.C. employee for the very same conduct; denying Ms. Leongini travel approval; denying Ms. Leongini's request to temporarily leave 30 minutes early (while continuing to work at home) due to temporary Metro shutdowns affecting her commute while allowing a married colleague to remain on NAWC payroll during a leave of absence for an internship; providing support for Ms. Leongini's married colleagues (or colleagues with children) but not for Ms. Leongini; requiring Ms. Leongini to take on duties and responsibilities out of her area, when she was already overburdened, with no support, and accusing her of not being a "team player" when she resisted; accusing Ms. Leongini of soliciting her own positive feedback from members (despite the fact that her track record and performance supported and warranted the praise); holding Ms. Leongini to different standards than her married colleagues/colleagues with families; and generally treating Ms. Leongini in a hostile manner with disparate treatment while not treating married employees/employees with families in the same manner.

109.    The discriminatory conduct of Mr. Powelson was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Leongini's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief.

110.    The discriminatory conduct of Mr. Powelson had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq.*, in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

111.    As a direct and proximate result, Ms. Leongini has suffered, and will in the future suffer, great damages including loss of past and future income, loss of employee benefits, including retirement benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to her reputation, mental anguish, stress, pain and suffering.

112.    As a direct and proximate result of the discrimination aided and abetted by Mr. Powelson, Ms. Leongini is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code § 2-1403.13 and the Code of the D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq.*

113.    Because of the character and severity of the conduct of Mr. Powelson as set forth above, Ms. Leongini is also entitled to punitive damages.

### COUNT THREE –
### RETALIATION IN VIOLATION OF
### <u>THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT</u>
### (against National Association of Water Companies)

114.    The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

115.    Ms. Leongini was an employee of NAWC within the meaning of D.C. Code § 2-1401.02(9).

116.    NAWC is an employer within the meaning of D.C. Code § 2-1401.02(10).

117.     NAWC, through its agents, officers and employees, retaliated against Ms. Leongini because she complained about the discriminatory and hostile treatment to which she was being subjected.  This retaliation was with respect to the terms, conditions, and privileges of Ms. Leongini's employment, in violation of D.C. Code § 2-1402.11.

118.     Rather than remedying the discriminatory working environment after Ms. Leongini complained, NAWC engaged in a course of retaliatory conduct in order to terminate Ms. Leongini's employment, in violation of D.C. Code § 2-1402.11(a)(1).

119.     Ms. Leongini complained about the discriminatory and hostile treatment to which she was being subjected to Maureen Duffy (NAWC Member/Strategic Planning Committee) in December 2018, to Shannon Dean (NAWC Member/Strategic Planning Committee/ Communications Counsel) in October of 2018, to Denise Kruger (NAWC Member/ Communications Council) in February 2019, to Mr. Powelson in July 2019, and to Rich Henning (NAWC Member/Communications Counsel) in December of 2019.

120.     After another staff member complained to a Board member, Mr. Powelson told the staff that he was aware that a staff member had spoken about him with a Board member, and he warned that if he learned any staff member spoke about him to a Board member, "There will be consequences."  Mr. Powelson's words were meant to be, and were perceived as, a threat to anyone's job security who complained about him or his conduct – a protected activity – and Ms. Leongini felt very threatened by his words.

121.     After Ms. Leongini complained to Mr. Powelson in July 2019, Mr. Powelson zeroed out Ms. Leongini's accrued PTO with no warning or explanation (other than stating he

had changed the policy), and falsely accused Ms. Leongini of credit card fraud triggering an

investigation into her use of the corporate credit card.  The fabrication and creation of false

performance issues against Ms. Leongini were an attempt to justify her retaliatory termination.

122.    Ms. Leongini was terminated on January 6, 2020, at which time NAWC

(unsuccessfully) attempted to pressure Ms. Leongini into signing a release of claims.

123.    NAWC engaged in the retaliatory conduct set forth above and throughout this

Complaint because Ms. Leongini complained of discrimination and a hostile work environment,

which was based on Ms. Leongini's marital status (single) in violation of D.C. Code § 2-

1402.11(a)(1).

124.    Ms. Leongini was terminated as a result of the retaliation to which she was

subjected.

125.    This retaliation involved and affected the terms, conditions, and privileges of Ms.

Leongini's employment in violation of D.C. Code § 2-1402.11.

126.    The actions of NAWC had the effect and consequence of violating the provisions

of the D.C. Human Rights Act, D.C. Code § 2-1401, *et seq.*, in violation of D.C. Code § 2-

1402.11.

127.    The retaliatory actions of NAWC were intentional, were actuated by malice, spite,

and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for Ms.

Leongini's rights.

128.    As a direct and proximate result of NAWC's conduct, Ms. Leongini has suffered,

and will in the future suffer, great damage including loss of past and future income, loss of

employee benefits, loss of career and business opportunities and advancement, past pecuniary

expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of

betrayal, isolation and profound injustice, damage to her reputation, mental anguish, stress, pain

and suffering.

129.    As a direct and proximate result of NAWC's retaliation, Ms. Leongini is entitled

to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13

and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq*.

130.    Due to the character and severity of the actions of NAWC, and consistent with its

intentional retaliation, Ms. Leongini is also entitled to punitive damages.

**COUNT FOUR –**
**AIDING AND ABETTING RETALIATION IN**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against Robert F. Powelson)**

131.    The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

132.    Through his individual actions, Mr. Powelson aided and abetted the retaliation

against Ms. Leongini, as described in more detail in Count III above and throughout this

Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Powelson aided and abetted the

retaliation by NAWC because of his bias against Ms. Leongini based on her marital status

(single), and in order to justify her termination.

133.    Acts of retaliation aided and abetted by Mr. Powelson in supporting, condoning

and failing to bring an end to acts of retaliation by NAWC include those set forth in this Count

and throughout the Complaint:  threatening employees, including Ms. Leongini, that there would

be "consequences" if they complained about him (after learning from a Board member that an

employee had complained about him), zeroing out Ms. Leongini's accrued PTO with no warning

or explanation (other than stating he had changed the policy), and falsely accusing Ms. Leongini

30

of credit card fraud triggering an investigation into her use of the corporate credit card.  The fabrication and creation of false performance issues against Ms. Leongini were an attempt to justify her retaliatory termination.

134.    The retaliatory conduct of Mr. Powelson was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Leongini's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief.

135.    The retaliatory conduct of Mr. Powelson had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq.*, in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

136.    As a direct and proximate result, Ms. Leongini has suffered, and will in the future suffer, great damages including loss of past and future income, loss of employee benefits, including retirement benefits, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to her reputation, mental anguish, stress, pain and suffering.

137.    As a direct and proximate result of the retaliation aided and abetted by Mr. Powelson, Ms. Leongini is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code § 2-1403.13 and the Code of the D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq.*

138.    Because of the character and severity of the conduct of Mr. Powelson as set forth above, Ms. Leongini is also entitled to punitive damages.

**COUNT FIVE –**
**VIOLATION OF THE D.C. WAGE PAYMENT ACT**
**(against National Association of Water Companies)**

139.    The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

140.    Ms. Leongini was not terminated for performance based reasons, and NAWC did

not follow or implement the steps of its progressive discipline policy, as outlined in the NAWC

Employee Handbook, prior to terminating Ms. Leongini.

141.    NAWC's Severance Policy (referenced in the addendum to the Employee

Handbook) states that "[r]egular severance benefits will be granted according to the following

schedule of benefits," Ms. Leongini was (and is) entitled to 26 weeks of severance - $90,458.29 –

which should have been paid to Ms. Leongini on the next business day following her termination.

142.    Ms. Leongini was also never compensated for her unused and earned vacation and

PTO time as required pursuant to NAWC's handbook and D.C. law (vacation pay qualifies as "

wages" under the DCWPCL), in the amount of $11,561.76.  This amount does not include the

200 hours of unused and earned PTO that Mr. Powelson arbitrarily deleted in August 2019 with

no warning, which Ms. Leongini was not given the opportunity to use, which equates to an

additional $16,058.

143.    NAWC also failed to pay Ms. Leongini her bonus for 2019, which she should

have received in January 2020, in the approximate amount of $8,375.00 (approximately 5% of

her salary).

144.    Ms. Leongini also did not receive her final paycheck the day after her termination,

as is required under D.C. Code §32-1303(1), as well as some amounts that remain due and owing

32

to her based on expense reports submitted. Ms. Leongini did not receive her final paycheck until January 15, 2020, in violation of the DCWPCL.

145.   As such, Ms. Leongini is entitled to 26 weeks of severance ($90,458.29), 18 days of PTO acknowledged as due and owing by NAWC ($11,561.76), an additional 200 hours of PTO with was deleted with no warning based on Mr. Powelson's arbitrary "change in policy" and which Ms. Leongini was not given an opportunity to use ($16,058), her 2019 bonus (approximately $8375); such other amounts to be proven by Ms. Leongini due to her from expense reports submitted but not paid by NAWC, four (4) times the amount owed to her, statutory damages, attorney's fees and costs, and appropriate injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marybeth Leongini requests that this Court enter judgment in her favor, and against the Defendants, NATIONAL ASSOCIATON OF WATER COMPANIES and ROBERT F. POWELSON, jointly and severally, on the above counts as applicable to each, and further:

(a)   Award Ms. Leongini compensatory damages of $750,000 (Seven Hundred Fifty Thousand Dollars) on each of the above-stated Counts One through Four; and in addition

(b)   Award Ms. Leongini punitive and exemplary damages of $2 million (Two Million Dollars) on each of the above-stated Counts One through Four; and in addition

(c)   Award Ms. Leongini four (4) times the amounts owed to her as set forth in Count Five, plus statutory damages, attorney's fees and costs, and appropriate injunctive relief; and in adddition

(d)   Award Ms. Leongini reasonable attorneys' fees and the costs of this action, including expert witness fees; and in addition

(e)     Declare that the Defendant NAWC has violated the District of Columbia Human Rights Act; and in addition

(f)     Declare that Defendant NAWC has violated the D.C. Wage Payment and Collection Law; and in addition

(g)     Enjoin the Defendants from further violations of the District of Columbia Human Rights Act; and in addition,

(h)     Award Ms. Leongini such other and further relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

**PLAINTIFF MARYBETH LEONGINI DEMANDS A TRIAL BY JURY.**

July 23, 2020                                      Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, DC Bar No. 474097
cbrown@cbcblaw.com
CHARLSON BREDEHOFT
  COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Marybeth Leongini*