UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARYBETH LEONGINI,

        *Plaintiff*,

  v.

NATIONAL ASSOCIATION OF WATER
COMPANIES, et al.,

        *Defendants*.

Civil Action No. 1:20-cv-02502 (CJN)

## MEMORANDUM OPINION

Marybeth Leongini brought this suit in D.C. Superior Court, alleging that her former employer and its Chief Executive Officer discriminated against her based on her marital status and then retaliated against her after she complained. *See generally* Compl., ECF No. 1. Defendants removed the case to federal court and shortly thereafter moved to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). For the reasons stated below, Defendants' Motion is granted in part and denied in part.

### I.    Background

Leongini began working for the National Association of Water Companies, a non-profit corporation representing regulated water and wastewater companies throughout the United States, in 2012. Compl. ¶ 17.[1] Initially, she served as the Association's Director of Communications at its headquarters in Washington, D.C. *Id.* Six years later, the Association's Board of Directors

---

[1] The following factual summary is drawn from the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the Complaint, and matters about which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997).

1

asked Leongini to serve as interim Executive Director. *Id.* ¶ 19. Leongini alleges that while serving as interim Executive Director, the Association asked her to take on the duties of the Executive Director while also continuing to perform the tasks she performed as Director of Communications. *Id.* According to the Complaint, Leongini excelled in her new role, so much so that the then-Chairman of the Association's Board told Leongini that she would receive a raise and a new title (Vice President), and that when the Association's headquarters moved to Philadelphia, she could continue to work out of the Washington, D.C. office. *Id.* ¶ 22. But, Leongini alleges, the Association reneged on those promises.

The trouble for Leongini started in August 2018 when the Association hired Robert Powelson as its Chief Executive Officer. Compl ¶ 22. Powelson, according to the Complaint, "[a]lmost immediately" subjected Leongini "to hostile and disparate treatment"—treating her less favorably than her married colleagues. *Id.* ¶ 24. For instance, Powelson increased Leongini's workload while lightening the load for her married peers, Compl. ¶ 35; blamed Leongini for shortcomings while her married coworkers avoided criticism, Compl. ¶ 38; and denied Leongini permission to leave work early, while granting her married colleagues' requests for extended leave or to work from home, Compl. ¶ 49.

Leongini voiced concerns about this treatment. Less than a year after the Association hired Powelson, Leongini complained to him and pointed out that "she was the only one on the team that he regularly screamed at, and that she never heard him raise his voice to Christina Costello or April Ballou"—two of Leongini's married colleagues. Compl. ¶ 53. Two weeks after this conversation, Powelson "inexplicably zeroed out" Leongini's accrued paid time off. *Id.* ¶ 56. When Leongini inquired, Powelson informed her that there had been a change in the Association's paid time off policy. *Id.*

Two months later, Powelson criticized Leongini for not turning in expense reports in a timely manner. Compl. ¶¶ 75–80. Leongini alleges that Powelson contrasted this performance with that of her married colleagues, saying that Leongini's married colleagues had no trouble getting their own reports in, despite having responsibilities to spouses and children at home. *Id.*

Shortly thereafter, Powelson told Leongini that she would no longer be able to work from the Washington, D.C. office and would instead need to relocate to the new headquarters in Philadelphia. Compl. ¶ 82. Every other staff member in the Washington office—all of whom were married—was permitted to continue working from the Washington office. *Id.*

In January 2020, the Association terminated Leongini. Compl. ¶ 84. Although the rationale for the termination was not fully explained to her, Powelson did say that her failing timely to complete her expense reports was the "last straw." Compl. ¶ 85. Leongini alleges that, at the time of her termination, she was entitled to 26 weeks of severance pay, Compl. ¶ 90; 18 earned vacation days, Compl. ¶ 91; 200 hours of paid time off, Compl. ¶ 91; and her 2019 year-end bonus, Compl. ¶ 92.

Eight months after her termination, Leongini filed this suit against the Association and Powelson in the D.C. Superior Court, alleging claims of discrimination and retaliation (and aiding and abetting of discrimination and retaliation) under the D.C. Human Rights Act ("DCHRA"); and claims for unpaid wages under the D.C. Wage Payment and Collection Law ("DCWPCL"). *See generally* Compl. Defendants removed to this Court and moved to dismiss the complaint for failure to state a claim. *See generally* Defs.' Mot.

## II.     Standard of Review

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit

of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted). Although the Court accepts all well-pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotations and citations omitted). The claim to relief must be "plausible on its face," and a plaintiff's pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

### III.     Analysis

#### A.     Discrimination Claims

Defendants begin by challenging Leongini's discrimination claims. For a discrimination claim (and an aiding and abetting discrimination claim) under the DCHRA to survive a motion to dismiss, a plaintiff must allege well-pleaded facts from which a reasonable finder of fact could infer that (1) she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 283 F.3d 135, 145 (D.C. Cir. 2002). The Parties agree that the Complaint properly alleges that Leongini is a member of a protected class under the DCHRA. Yet they disagree about whether the second and third elements have been properly alleged. Defs.' Mot. at 11–15.

Defendants first argue that the Complaint does not properly allege that Leongini suffered an adverse employment action. Defs.' Mot. at 11. To make out this second prong, a plaintiff must allege facts showing "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

4

significant change in benefits." *Walden v. Patient-Centered Outcomes Research Inst.*, 304 F. Supp. 123, 133 (D.D.C. 2018). While an adverse employment action covers actions that may not result in "readily quantifiable losses," it is not so broad as to encompass every action that makes an employee "unhappy." *Russell v. Principi*, 25 F.3d 815, 818 (D.C. Cir. 2001). The key question is whether the employee experienced a "tangible *change* in the duties or working conditions constituting a material employment disadvantage." *Walden*, 304 F. Supp. at 133–34.

To be sure, as Defendants note, Leongini's Complaint contains numerous examples of alleged actions which alone did not result in a tangible change of Leongini's duties or working conditions. For example, the Complaint alleges that Powelson screamed at Leongini, Compl. ¶ 71; accused her of soliciting compliments from member companies, Compl. ¶ 40, 45; told her that her colleagues did not like her, Compl. ¶ 52; and failed to respond to her emails, Compl. ¶ 70. These actions, even when taken in conjunction, do not represent an adverse employment action. *See, e.g.*, *Walden*, 304 F. Supp. 3d at 134 (holding that a laundry list of perceived slights including several negative performance reviews and assessments, denied paid-time-off requests, and an increased workload did not constitute an adverse unemployment actions); *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 190 (D.D.C. 2012) (finding allegations that supervisor treated plaintiff "like a whipping boy" by "scream[ing] at, talk[ing] down to, and point[ing] her finger" at plaintiff did not rise to the level of adverse action); *Russ v. Van Scoyoc Assoc., Inc.*, 122 F. Supp. 2d 29, 32 (D.D.C. 2000) ("[I]t is clear that being yelled at by your supervisor does not rise to the level of an adverse employment action.").

But the Complaint contains more than just these "scattershot" allegations. *Walden*, 304 F. Supp. 3d at 133. For instance, the Complaint alleges that Powelson fired Leongini and "zeroed out" the paid time off she had accrued. Compl. ¶¶ 56, 84. Defendants fail to truly grapple with

5

this contention, and instead concede in a footnote that the termination of employment and elimination of Leongini's accrued paid time off "may amount to an adverse employment action." Def.'s Mot. at 11 n.4.  There's no serious question that such steps constitute adverse employment actions.  *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (listing paradigmatic examples of adverse employment actions as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.").  The only remaining question, then, is whether the Complaint alleges facts sufficient to allow the reasonable inference that Defendants took those actions *because* Leongini was unmarried.

It does.  The Complaint alleges that Powelson increased Leongini's workload while lightening the load for her married peers, Compl. ¶ 35; blamed Leongini for shortcomings while her married coworkers escaped criticism, Compl. ¶ 38; and denied Leongini permission to leave work early to avoid traffic, while granting her married coworkers' extended leave and work from home requests, Compl. ¶ 49.  It further alleges that Powelson, when reprimanding Leongini for failing to complete her expense reports, specifically drew attention to her marital status.  He allegedly told Leongini that her married "colleagues travel and they leave their spouses and children and still manage to get their expenses in on time."  Compl. ¶ 77.  Powelson later cited Leongini's tardy expense reports as the "final straw" when he terminated her.  Compl. ¶ 85.  These allegations, if true, would permit a reasonable juror to conclude that Leongini was fired because of her unmarried status.

The Court holds that Leongini has alleged facts sufficient to state a claim of discrimination and aiding and abetting discrimination under the DCHRA.  Defendant's Motion to Dismiss as to these claims is denied.

6

### B.     Retaliation Claims

Leongini alleges that Defendants also retaliated against her after she complained about her treatment. Compl. ¶ 114–38. Defendants argue that this claim should be dismissed because the Complaint fails to make out a prima facie case of retaliation (and aiding and abetting retaliation) under the D.C. Human Rights Act. Def.'s Mot., at 18–26.

"The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws." *McCaskill*, 36 F. Supp. at 154 (quoting *McCain v. CCA of Tenn., Inc.*, 254 F. Supp. 2d 115, 124 (D.D.C. 2003)). For a retaliation claim to survive a motion to dismiss, a plaintiff must allege facts giving rise to the reasonable inference that "(1) she engaged in a statutorily protected activity; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006)).

Defendants' chief argument is that the Complaint does not allege facts that Leongini participated in a statutorily protected activity. [2] To make such a showing, a plaintiff must demonstrate that she made a complaint of discrimination to a superior. *Tsehaye v. William C. Smith & Co.*, 402 F. Supp. 3d a185, 197 (D.D.C. 2005). This "encompasses utilizing" both formal and "informal grievance procedures such as complaining to management or human resources about the discriminatory conduct." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 200 (D.D.C. 2012). But "[n]ot every complaint garners its author protection." *Id.* at 205 (quoting *Broderick v.*

---

[2] Defendants also claim that Leongini fails to state a *prima facie* retaliation claim because she does not allege that the Association took an adverse employment action against her. But this argument lacks merit. Leongini alleges that, after she had complained to Powleson, the Association zeroed out her accrued paid time off, *see* Compl. ¶ 56, and fired her, *see* Compl.¶ 84. These are sufficient allegations of an adverse employment action under the DCHRA. *See Propp v. Counterpart Int'l*, 39 A.3d 856, 866 (D.C. 2012) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 77–78 (2006).

*Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). "While no 'magic words' are required," *Broderick*, 437 F.3d at 1232, a complaint "must alert the employer that [the aggrieved employee] is lodging a complaint about allegedly discriminatory conduct," not just voicing a generalized grievance. *Howard Univ. v. Green*, 62 A.2d 41, 46 (D.C. 1994).

Defendants argue that Leongini's confrontation with Powelson was insufficient to alert Powelson (or the Association) to the fact that Leongini was accusing Powelson of discrimination based on marital status. Defs.' Mot. at 19–24.[3] Although the Complaint is indeed "light on the details" of the confrontation, *Ingram v. D.C. Child & Family Servs. Agency*, 394 F. Supp. 3d 119, 125 (D.D.C. 2019) (holding that despite being "light on the details" of an employee's exchange with her employer, the Complaint properly alleged a protected activity under the DCHRA), it does allege that Leongini "addressed Powelson's treatment of her"; "point[ed] out that she was the only one on the team that he regularly screamed at"; and compared Leongini to her married coworkers—Christine Costello or April Ballou—to whom Powelson never raised his voice. Compl. ¶ 57. Taking all inferences in Leongini's favor, it could be inferred that Leongini's conversation with Powelson, specifically the references to other married women in the office, would have been enough to alert Powelson that Leongini was alleging discrimination based on her marital status. Therefore, construing the Complaint liberally, the Court finds that Leongini has sufficiently alleged that her conversation with Powelson was a protected activity.

---

[3] The Parties also disagree about whether Leongini engaged in a statutorily protected activity when she complained to employees of the Association's member companies. *See* Defs.' Mot. at 20; Pl.'s Opp'n at 8. Because the Court finds that, as alleged, Leongini's complaint to Powell permits a finder of fact to draw a reasonable inference that Leongini engaged in a protected activity under the DCHRA, the Court need not (at this stage of the litigation) address the challenges to these other potentially protected activities.

Defendants also argue that Leongini has not properly pleaded facts sufficient to raise a reasonable inference that a causal connection existed between the statutorily protected activity and the adverse employment action taken against her. *See Siddique v. Macy's*, 923 F. Supp 2d 97, 107 (D.D.C. 2013). Defendants claim that neither the zeroing out of Leongini's paid time off nor her termination can be tied to her statutorily protected complaint. Defs.' Mot. at 26.

In particular, as to Leongini's termination, Defendants argue that it happened six months after Leongini complained, and thus that no reasonable juror could conclude that Powelson was retaliating against her for her protected activity. Defs.' Mot. at 26. It is true that "even at the *prima facie* stage, courts in the district generally require close temporal proximity in order to establish causation in the absence of direct evidence." *Durant v. District of Columbia*, 932 F. Supp. 2d 53, 72–73 (D.D.C. 2013). And the Court of Appeals has held that periods as short as two-and-a-half months are alone insufficient to raise an inference of retaliation. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009). But the Complaint alleges that Leongini's termination was part of a pattern of retaliatory behavior that began only two weeks after she engaged in a protected activity, which included zeroing out Leongini's paid time off, Compl. ¶ 121; accusing her of credit card fraud, Compl. ¶ 121; and warning staff members that there would be consequences for making complaints to the Board, Compl. ¶ 120. This pattern of alleged behavior toward Leongini bridges the temporal gap between her protected activity and her termination. The Court finds that at this early stage Leongini's allegations are sufficient to lead to the reasonable inference that her termination was due to her protected activity. *See Gipson v. Wells Fargo N.A.*, 460 F. Supp. 2d 15, 29 (D.D.C 2006) (holding that temporal proximity is given less weight where a plaintiff presents other evidence of causality for retaliation).

9

As to the zeroing out of Leongini's paid time off, Defendants argue that the Complaint does not allege enough facts to raise a reasonable inference that Defendants did so because she complained to Powelson. *See* Defs.' Mot. 26. They argue that the only reasonable inference is that the deletion of Leongini's paid time off hours was part of a larger change in company policy. They point to Powelson's alleged response to Leongini's inquiry about the paid time off, in which Powelson told Leongini that the zeroing-out process was due to a "change in policy." Compl. ¶ 56. Although Defendants' interpretation of the facts may very well be a reasonable one, it is far from the *only* reasonable inference that can be drawn, and on a motion to dismiss, the Court must construe all reasonable inferences in a plaintiff's favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor.").

In this circuit, "a close temporal relationship may alone establish the required causal connection," *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir 2003), so long as the "two events are very close in time." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir 2007) (internal quotations omitted). Here, Leongini alleged that two weeks after she complained, her paid time off was zeroed-out. At the motion to dismiss stage, a two-week gap is sufficient to raise an inference of a causal connection. *See, e.g.*, *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (finding a gap of one month sufficient to raise an inference of causality); *Woodruff*, 482 F.3d at 529 (concluding that a period of "less than a month" sufficient to raise the inference); *Singletary*, 351 F.3d at 525 (holding that the district court erred when it did not found a month-long gap insufficient to raise a reasonable inference of causality).

Because the Complaint alleges facts sufficient to lead to a reasonable inference that Leongini satisfied each required element of her *prima facie* retaliation and aiding and abetting retaliation claims, the Court holds that she has properly stated retaliation claims for which relief can be granted. Those claims therefore survive Defendants' Motion to Dismiss.[4]

### C.   D.C. Wage Payment and Collection Law Claim

Defendants also challenge Leongini's final claim under the D.C. Wage Payment and Collection Law ("DCWPCL"). Leongini claims that she is entitled to (1) severance pay under the Association's Severance Policy contained in the Employee Handbook; (2) 18 days of paid time off (PTO); (3) an additional 203.5 hours of accrued PTO that Pawelson eliminated when enacting a PTO policy change; (4) her 2019 bonus, and (5) statutory damages based on the belated delivery of her final paycheck. *See* Compl. ¶ 140–45.

The DCWPCL requires that "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge." D.C. Code § 32-1303(1). The DCWPCL defines "wages" as "all monetary compensation after lawful deductions owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation." D.C. Code § 32-1301(3). This entitlement includes all bonuses, commissions, fringe benefits paid in case, overtime premiums, and other remuneration promised or owed under (1) a written or oral contract for employment, (2) a contract between the employer and a third party, or (3) District or federal law.

---

[4] Leongini also seeks punitive damages for each DCHRA claim. *See* Compl. ¶¶ 105, 113, 130, 138. Defendants argue (briefly) that these claims should be dismissed because the Compliant fails to allege facts sufficient to support a finding that the Defendants acted with actual malice, a required element of a punitive damages claim under the DCHRA. *See Daka, Inc. v. Breiner*, 711 A.2d 86, 98 (D.C. 1998); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 372 (D.C. 1993). The Court disagrees. The Complaint includes various allegations that, if true, could lead a reasonable juror to conclude that Powelson acted with actual malice toward Leongini.

*See id.* Importantly, a "discretionary payment" does not constitute a "wage" under the DCWPCL because such payments "are not *owed*, but are given only by leave of the employer." *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 36 (D.D.C. 2010) (emphasis added). Whether a payment is "discretionary" turns on "the conditions set for the award of such compensation" and if "the employee was actually entitled or owed the payment." *Rothberg v. Xerox Corp.*, 2016 WL 10953882, at *16 (D.D.C. 2016), *aff'd* 709 F. App'x 1 (D.C. Cir. 2017).

**Severance Pay.** The Complaint alleges that Leongini is entitled to 26 weeks of severance pay as guaranteed by the Association's Severance Policy. *See* Compl. ¶ 141. That policy, according to the Complaint, is outlined in an addendum to the Employee Handbook, which (as quoted in the Complaint) states that "[r]egular severance benefits will be granted according to the following schedule of benefits." *Id.* Despite briefly quoting from the addendum, the Complaint does not include the schedule of benefits, and the addendum is not attached to the Complaint. Instead, the Complaint simply alleges that based on the unattached schedule of benefits Leongini is "entitled to 26 weeks of severance," or "$90,458.29." *Id.*

Defendants argue severance cannot be owed because the addendum, and the severance policy allegedly contained therein, do not exist. *See* Defs.' Mot. at 28. Defendants surmise that Leongini might be relying on a previous Employee Handbook, which contained a severance policy in an accompanying addendum. *Id.* But they insist that the current handbook, which was updated in 2016, no longer includes such an addendum and so Leongini's claim must fail because she cannot point to evidence demonstrating that she is owed severance.[5]

---

[5] The current Employee Handbook, as Defendants point out, includes a provision stating that it "supersedes all previous Company handbooks and policies, other than the policy of at-will employment." Nat'l Ass'n of Water Cos. Employee Handbook, Exhibit A, ECF No. 4-1, at 8.

12

It may very well be the case that the relevant Employee Handbook was not accompanied by an addendum guaranteeing severance payments, but the Court cannot wade into this factual dispute now.  Instead, the Court must take all well-pleaded allegations as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555.  Leongini alleges that the addendum to the Employee Handbook outlined that she was entitled to 26 weeks of severance pay.  Compl. ¶ 141.  If true, this would entitle Leongini to relief under the DCWPCL.  The Court therefore finds that Plaintiff's DCWPCL claim as to her severance pay survives Defendants' Motion to Dismiss.

**Bonus.**  The Complaint also alleges that Leongini is entitled to a roughly $8375 bonus that she claims she would have received in January 2020, the same month she was terminated.  *See* Mot. at 30; *see also* Compl. ¶ 143.  "Bonuses are covered under the D.C. Wage Payment Act only when they are owed," *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 36 (D.D.C. 2010), meaning that they cannot be subject to an employer's discretion, but must be "automatic and mandatory upon satisfaction" of specific conditions.  *Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 134 (D.D.C. 2018).

The Association's Employee Handbook, which Leongini incorporates by reference into her Complaint to demonstrate that the bonus was owed, *see Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008), states:  "Each year in December, the [Association] awards individual bonuses for employees that meet or exceed performance criteria and individual goals."  Nat'l Ass'n of Water Cos. Employee Handbook, Exhibit A, ECF No. 4-1, at 28.  If an Association employee met those criteria and goals, the bonus payment would be "automatic and mandatory."  *Molok*, 297 F. Supp. 3d at 134.

But the Complaint does not say what Leongini's performance criteria and individual goals were, and it does not say that she successfully accomplished them.  The Complaint therefore does

not plead sufficient facts to substantiate the claim that the Association owed Leongini a bonus. *See Brady v. Liquidity Services, Inc.*, 2018 WL 6267766, *4 (D.D.C. 2018) (holding that an employee plaintiff failed to state a DCPWCL claim to a bonus when the Complaint contained "no allegations that [the employee] met those objectives" required to be entitled to the bonus)  The DCWPCL claim as to Leongini's bonus is dismissed.

**Paid Time Off.**  The Complaint also alleges that Leongini is entitled to 203.5 hours of PTO, which Powelson allegedly eliminated in August 2019.[6]  Defendants, again pointing to the Employee Handbook, argue that Leongini has failed to properly allege that these hours were actually owed.  Defs.' Mot. at 28.  According to the Handbook, each Association employee receives eighteen days of paid time off per year.  That time must be used within the calendar year it is issued and cannot be carried over to the next year—unless the employee seeks and is granted an exemption, in which case the employee is permitted to carry over up to 70 hours.  *See* Nat'l Ass'n of Water Cos. Employee Handbook, Exhibit A, ECF No. 4-1, at 8.  Defendants note that in order to amass the 203.5 hours, Leongini would have needed to receive an exemption.  Because the Complaint does not allege that Leongini sought an exemption (or discuss any of the intricacies of the paid-time-off accruement program), Defendants argue, Leongini has failed to create even an inference that the 203.5 hours were actually owed to her.  *Id.*

The Court disagrees.  Leongini does not allege that, if she were to meet certain conditions, she would accrue PTO.  *See Brady*, 2018 WL 6267766 at *4.  Rather, she alleges that she had

---

[6] The Complaint also alleges that the Association owed Leongini an additional $11,561.76—the value of her eighteen unused vacation days.  *See* Compl. ¶ 91.  Shortly after filing her Complaint, the Association sent Leongini a check for that amount.  *See* September 10, 2020 Ltr. from Cozen O'Connor to Carla D. Brown, ECF No. 4-4, at 1.  The Parties agree that this ends the matter as to the previously unpaid eighteen unused vacation days, although, as discussed below, they dispute the amount of liquidated damages that result under the DCWPCL for the delayed payment.

*already* accrued the PTO, such that those hours were no longer conditional or left to the discretion of the employer (like her bonus). They were therefore already owed to her, she alleges, and then taken away by Powelson—an action Powelson has acknowledged, according to the Complaint. Compl. ¶ 56. This claim therefore survives Defendants' Motion to Dismiss.

**Liquidated Damages.** The Complaint also alleges that Leongini is entitled to liquidated damages under the DCWPCL because her wage payments were (and, at least as to some wages allegedly owed, continue to be) delayed. *See* Compl. ¶ 139–45.

Defendants raise a discrete challenge to these claims, arguing only that the liquidated damages claims involving Leongini's final paycheck and vacation pay owed should be dismissed. Def.'s Mot. at 32–33. The Parties agree that Defendants have paid some of the liquidated damages allegedly owed, yet they disagree about whether the amount paid covers the Association's obligation under the DCWPCL.

The DCWPCL "provide[s] for liquidated damages in addition to recovery for unpaid wages." *Reyes v. Kimuell*, 270 F. Supp. 3d 30, 36 (D.D.C. 2017). An employer is liable for liquidated damages under the DCWPCL when it fails to deliver to a terminated employee her earned wages by the first working day following the employee's discharge. *See* D.C. Code § 32-1303(1). Liquidated damages are calculated as the lesser of "an amount equal to treble the unpaid wages" or ten percent of the unpaid wages "for each working day during which such failure shall continue after the day upon which payment is hereunder required." D.C. Code § 32-1303(4).

Looking first at Leongini's final paycheck, the Parties agree that her net final paycheck totaled $1,278.96 and that she is entitled to ten percent of that sum for "working day[s]" that passed "after the day upon which payment" was required. *See* September 10, 2020 Ltr. from Cozen O'Connor to Carla D. Brown, ECF No. 4-4, at 1; Pl.'s Opp'n, at 11. The Complaint alleges that

15

Leongini was fired on January 6 and did not receive her final paycheck until January 15. *See* Compl. ¶ 144. The Parties (as they must at this stage of the litigation) take these facts as true. They disagree only about the calculation of liquidated damages. Specifically, they disagree about the number of "working day[s]" that passed "after the day upon which payment" was required. Leongini claims that six working days passed, while Defendants argue that five working days is correct. Defs.' Mot. at Pl.'s Opp'n at 11.[7]

The dispute boils down to whether January 7—the day on which payment was due to Leongini under the DCWPCL—is included in the working days calculation. A plain reading of the statute shows it is not. The DCWPCL provides that liquidated damages shall be calculated "for each working day during which such failure [to pay the employee her owed wages] shall continue *after* the day upon which payment is hereunder required." D.C. Code § 32-1303(4) (emphasis added). Payment was required on January 7, and the counting of working days begins on the next day *after* the payment was due, *i.e.*, January 8. The Court therefore agrees with Defendants that liquidated damages for the delayed final paycheck should only be calculated for five days, and since the Association has already paid Leongini for five days' worth of liquidated damages, Pl.'s Opp'n at 11, the claim as to her final paycheck is dismissed.

As to the liquidated damages that the Association allegedly owe for its delay in paying Leongini for her unused vacation days, the Parties agree that a payment of treble damages is appropriate. Yet they again disagree about how to calculate that amount. Leongini argues that she is entitled to $23,583.99 in liquidated damages—or three times the $7,861.33 she was actually owed for her accrued vacation—*plus* the actual amount of $7,861.33. Defendants argue that their

---

[7] The Parties stipulate that January 11 and 12 were weekend days, in which liquidated damages did not accrue.

payment of $15,722.66 in liquidated damages—or twice the amount Leongini alleges she was owed for her accrued vacation—is correct on the ground that the DCWPCL requires a *total* payment of three times the wages owed.

Plaintiff has the better argument. The DCWPCL is clear: Employers are "additionally liable" for "liquidated damages" when the employer fails to make timely payment of an employee's earned wages. D.C. Code § 32-1303(4). The liquidated damages are provided *on top of* the earned wages owed. *See Amaya v. Logo Enterprises, LLC*, 251 F. Supp. 3d 196, 201 (D.D.C. 2017). Therefore, taking the allegations in the Complaint as true as the Court must, liquidated damages would total $23,583.99—three times the underpayment—not $15,722.66. This portion of the liquidated damages claim therefore survives Defendants' Motion to Dismiss.

## IV. Conclusion

For the reasons discussed above, Defendants' Motion to Dismiss, ECF No. 4, is denied in part and granted in part.

DATE:  August 25, 2021

CARL J. NICHOLS
United States District Judge